UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

MARTIN LEWIS                                 :            00 Cr. 1118 (JSR)

        *Petitioner-Defendant*,

        - v. -                                      :

UNITED STATES OF AMERICA,                     :

               *Respondent*.

                           :

------------------------------------------------------------------x


**MOTION FOR SENTENCE REDUCTION**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**


David Patton, Esq.
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8772
Counsel for Martin Lewis


TO:    Audrey Strauss, Esq.
        Acting United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn: AUSA Jonathan Rebold, Esq.

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

   I.   The Crime ..............................................................................................................4

   II.  The Sentencing ......................................................................................................7

   III. Life in Prison...........................................................................................................8

ARGUMENT ...................................................................................................................11

   I.   Under the First Step Act, this Court Has Expansive
       Authority to Reduce a Sentence. ............................................................. 11

   II.  Mr. Lewis Has Met Any Statutory "Exhaustion" Requirement... ...............................14

   III. There Are Extraordinary and Compelling Reasons to Reduce
       Mr. Lewis's Sentence…………………………………………………………...15

        A.    COVID-19 and Mr. Lewis's Serious Respiratory Illness……...……………15

        B.    The Circumstances of Mr. Lewis's Offense and Comparative Sentences………..20

        C.    Rehabilitation …………………………………………………………22

CONCLUSION …………………………………………………………………………24

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

*United States v. Adam Field*,
   No. 18 Cr. 426 (JPO) ............................................................................................12

*United States v. Amarrah*,
   2020 WL 2220008 (E.D. Mich. May 7, 2020)..........................................................18

*United States v. Asaro*,
   No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. April 17, 2020) ...................18

*United States v. Atkinson*,
   No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585 (D. Nev. Apr. 17, 2020) ...........18

*United States v. Austin*,
   No. 06 Cr. 991 ........................................................................................................11

*United States v. Beck*,
   No. 13 Cr. 186-, 2019 WL 2716505 (M.D.N.C. June 28, 2019) .............................14

*United States v. Ben-Yhwh*,
   No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020)....................18

*United States v. Bucci*,
   409 F. Supp. 3d 1 (D. Mass. 2019) .........................................................................13

*United States v. Burrill*,
   No. 17-CR-00491-RS-1, 2020 WL 1846788 (N.D. Cal., April 10, 2020)..........................18, 19

*United States v. Carvajal*, 04 Cr. 222 (AKH),
   (Feb. 22, 2005), 2005 WL 476125 ........................................................................2, 5

*United States v. Eric Millan*,
   No. 91 Cr. (LAP)................................................................................................12, 13

*United States v. Gregory Cooper*,
   No. 08 Cr. 356 (KMK) ...........................................................................................13

*United States v. Ivars Ozols*,
   No. 16 Cr. 692 (JMF) .............................................................................................12

*United States v. Haney*,
   No. 19 Cr. 541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020)......................14

*United States v. Jeffrey Musumeci*,
   No. 07 Cr. 402 (RMB) ...........................................................................................13

*United States v. Maumau*,
  No. 08 Cr. 758 (TC), 2020 WL 806121 (D. Utah Feb. 18, 2020) ............................................13

*United States v. Phillip Smith*,
  No. 12 Cr. 133 (JFK) ........................................................................................................14

*United States v. Pinto-Thomaz*,
  No. 18 Cr. 579 (JSR), 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) ...................................11

*United States v. Redd*,
  No. 97 Cr.  (AJT), 2020 WL 1248493 (E.D. Va. Mar. 16, 2020) ..........................11, 12, 13, 14

*United States v. Resnick*,
  No.12 Cr. 152 (CM) ..........................................................................................................14

*United States v. Scparta*,
  No. 18 Cr. 578 (AJN) ........................................................................................................14

*Wesam El-Hanafi*,
  No. 10 Cr. 162 (KMW) ......................................................................................................14

*United States v. Urkevich*,
  No. 03 Cr. 37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) ...............................................13

## Statutes & Regulations

18 U.S.C. § 3582(c)(1)(A) .............................................................................................1, 11, 12, 13

18 U.S.C. § 3582(c)(1)(A)(i) ................................................................................................10

## Other Authorities

S. Rep. No. 98-225……………………………………………………………………………12

## INTRODUCTION

Martin Lewis respectfully submits this motion seeking a sentence reduction pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A).

Mr. Lewis is 66 years old.  He has served over 19 years in federal prison (with good time, the equivalent of a 23-year sentence) and has been a model inmate:  no disciplinary infractions, a glowing work record, and dozens of programs completed.  He also suffers from well-documented and significant health issues, including chronic bronchitis and asthma for which he has used two separate inhalers for seven years. Over the years, he has suffered extreme bouts of respiratory distress, including recently because of his incarceration at FCI Sheridan in Oregon where wildfires have exacerbated his condition.  Because of those health issues and his age, he is extremely susceptible to severe consequences of contracting COVID-19.

There is no sugar-coating the severity of his underlying offense. Although it was his first and only criminal conviction, he was sentenced to a mandatory life term for murder in aid of racketeering. And yet, as discussed below, there are extraordinary and compelling reasons to reduce his sentence and allow him to avoid the high risk that his natural life will be cut short by COVID-19.

First, Mr. Lewis meets all of the threshold requirements for relief.  Dozens of courts have found that people with similar age and health issues combined with the risk of contracting COVID-19 deserve relief.  Second, there were significant mitigating circumstances surrounding the offense that merit the exercise of the Court's discretion.  This was an organized crime case involving dozens of defendants who ran and were members of New Jersey's largest mafia family.  Mr. Lewis was not a member of the organization.  Instead, he was a bus driver for a company the mob controlled, and he was used by them to do their dirty work at a time when he was in desperate

circumstances attempting to care for his two young daughters as a single father.  Mr. Lewis committed a terrible crime, and he deeply regrets his conduct.  But he received a much harsher sentence than many who were leaders of the organization, ordered the killing, and are now at liberty.

Lastly, Mr. Lewis's demonstrated rehabilitation is precisely the example of hope and redemption deserving of a second chance.  Years ago, Judge Hellerstein discussed the importance of rehabilitation in sentencing and stated, "Hope is the necessary condition of mankind…"[1] Indeed, it is.  Mr. Lewis's 19 years in prison are a testament.

## BACKGROUND[2]

Mr. Lewis comes from a working class family. He was born on April 20, 1954 in Red Hook, Brooklyn as the fifth of seven children. His father was a New York City police officer and his mother was a dedicated mother of seven and a devoted Catholic. During his childhood, Mr. Lewis was inspired by his parents' dedication to service.  He joined the Cub Scouts, and as a teenager he became an Eagle Scout.  After graduating from high school and completing vocational training, Mr. Lewis became a bus mechanic for the New York City Transit Authority in 1979.  He loved the job.  He was proud of his working class roots, and he enjoyed working with his hands.  He was also good at his job and worked at it for over 10 years.

---

[1] *United States v. Carvajal*, 04 Cr. 222 (AKH) (Feb. 22, 2005), 2005 WL 476125 at *6.

[2] The facts discussed here derive from the original Presentence Report (attached as Exhibit A); Mr. Lewis's BOP medical records (attached as Exhibit B); Mr. Lewis's BOP programming and disciplinary records (attached as Exhibit C); Mr. Lewis's letter to the Court (attached as Exhibit D); and a letter to the Court from Mr. Lewis's daughter, Natalia (attached as Exhibit E).

The year after he started work as a mechanic, in 1980, he married Joyce Cutler.  They had two boys together, Jim and Bill, twins, and a third son, Joe, from his wife's previous relationship. Unfortunately, over the years, the oldest son, Joe, began getting into trouble, and Mr. Lewis and his wife began to struggle in their relationship.  In 1989, they attempted to make a fresh start by moving out of New York and down to Florida.  At the time, the twins were 12, and Joe was 17. They moved to an area of South Florida about 30 miles north of Miami.  Mr. Lewis bought a delivery route for Lay's potato chips and drove his own delivery truck.  But the change in scenery did not help.  He and his wife continued to fight.  He became depressed and began drinking. By 1991, the marriage had fallen apart, and they separated.  Mr. Lewis moved back to New York while Ms. Cutler stayed in Florida with the kids.

Though he saw his sons as often as he could, he desperately missed his family. It was an awful time for Mr. Lewis. But despite his depression, he was able to find work as a bus driver for a private company, Manti's Transportation.  He struggled financially because of his debts from the Lay's route he had bought in Florida and the expenses of supporting his family.  But he managed to meet all of those obligations while trying to rebuild his life in his childhood community of Red Hook.

He also fell in love with a woman named Linda Lopez.  Linda was working in a local real estate office, and they met in the neighborhood.  She had recently completed rehabilitation from a serious drug problem and had a young daughter, Eileen, who was only a few months old.  Mr. Lewis was drawn to Linda's beauty and resilience.  He also developed a close bond to Eileen and quickly became a doting father to her.  The three moved in together, and the following year, a fourth, Natalia, was on the way.  But the pregnancy was not easy and Linda began using drugs again.  Her drug problem soon spiraled out of control, and she became too unstable to be any sort

3

of responsible parent.  She was in and out of the family's life.  Mr. Lewis turned his focus to the girls, and with Ms. Lopez's consent, he obtained legal custody of both and began raising them as a single father.

Those years were an enormous struggle, but they were also some of the happiest of Mr. Lewis's life.  He and his two girls had a mantra:  it was them against the world.  They joked about it, but it was also true.  They forged a deep bond, born not just of their roles as father, daughters, and sisters, but of their shared experience navigating the rocky shoals of Linda's addiction and occasional periods of sobriety when she wanted desperately to be part of their lives, and they could not turn her away.

Linda would later die from a heroin overdose.  The havoc surrounding her last few years led Mr. Lewis to the events of this case.

### The Crime[3]

In 1998 Mr. Lewis had been working as a bus driver for Manti's for seven years.  He loved the job, but unfortunately, several years into it, the owner of the company, Al Manti, borrowed money from a loan shark named Joe Conigliaro.  As would later be charged by the government, Conigliaro, otherwise known as "Joe Pitts," was a member of the "Decavalcante Organized Crime Family of La Cosa Nostra," and when Al Manti could not pay his debts, his company was taken over by the mob.  The Decavalcante family was the largest organized crime family in New Jersey, and it coordinated regularly with the Five Families in New York.  The

---

[3] The roles of the defendants are described in the PSR at ¶¶ 27-44, and the details of the offense are described at ¶¶ 51-66.

defendants who were later charged in this case included members of the organization from top to bottom, including the boss, acting bosses, the consigliere, various "Capos," soldiers, and associates. Martin Lewis was none of those. But as a bus driver for Manti's, his new boss was Joe Conigliaro, and sometimes his bus routes included driving members of Conigliaro's crew when they made their extortionate collection rounds.

In 1998, the year that Mr. Lewis shot Conigliaro, he was in desperate financial straits. His daughters were four and two years old, and they had been evicted from their apartment because Linda (and her sister) stole the rent money to buy drugs. Mr. Lewis sent Eileen and Natalia to live with Linda's mother temporarily while he lived in a trailer behind the garage on Manti's property. It was not an ideal solution: Linda's mother was already caring for Linda's sister's three children, and he was worried about Linda's access to and bad influence on them. He was desperate to find a solution and a home for him and his daughters.

As Mr. Lewis was struggling, so too was Conigliaro. Conigiliaro had roused the ire of several of his fellow associates of an extortion crew by skimming proceeds from their illegal activities. He was also generally disliked for treating his crew members poorly and physically threatening them. Conigliaro was no stranger to violence: he was in a wheelchair as a result of his involvement in a shoot-out years earlier. Three crew members in particular did not like Conigliaro and wanted him dead. Those three were Americo Massa, Thomas DiTorra, and Joe Brideson. But the head of the crew would not let them take action. That changed in 1998 when a new head, Girolamo Palermo, was named "acting boss" and "caporegime" and gave them permission.

In addition to being a member of the extortion crew, DiTorra was the titular office manager at Manti's. During the time that Mr. Lewis was living in the trailer on Manti's property, Mr. Lewis confided in DiTorra that he was worried that Child Protective Services might take his children because of their living situation. DiTorra told the other members of the crew that he thought Lewis was desperate enough that they could pay him to kill Conigliaro. They all agreed, and Massa offered Mr. Lewis $10,000 and a higher paying job in one of the Decavalcante-controlled construction companies to shoot Conigliaro. Massa explained to Mr. Lewis that Conigliaro was a violent man and was threatening other members of the organization. In the midst of his desperation, and convinced that Conigliaro was a thug who was hurting and endangering others, Mr. Lewis agreed.

Massa, DiTorra, and Brideson then made the plans for the murder. Conigliaro kept several guns at Brideson's home (so that when he used them they would not be found in his own home). Brideson gave Mr. Lewis one of Conigliaro's own guns. Massa and DiTorra made arrangements to meet Conigliaro at a bar and created an excuse for Mr. Lewis to be present and for Massa and Lewis to get a ride home from Conigliaro. As Conigliaro dropped off Mr. Lewis, Mr. Lewis shot him several times with Conigliaro's own gun that Brideson had provided. Conigliaro was initially expected to live, and he told Brideson at the hospital that he was "amazed" that Lewis had shot him and suspected (correctly) that Massa was behind it. Conigliaro later died at the hospital, and over the next few weeks, Massa, DiTorra, and Brideson all took various steps to destroy evidence, lie to investigators, and corrupt a NYPD officer who was later charged as an accessory-after-the-fact. Following Conigliaro's death, Palermo took control of his extortion and loan-sharking operations.

**The Sentencing**

Then-Chief Judge Michael Mukasey presided over Mr. Lewis's trial.  Mr. Lewis's attorney at the time was Avi Moskowitz.  Because Mr. Lewis was convicted of murder in aid of racketeering and the sentence was mandatory life, there was not much to be said at the sentencing.  As Mr. Moskowitz stated, "This is one of those cases where I wish that something I could say could change the ultimate result, but I know that it can't.  I know that this is an aberration for Mr. Lewis, and I regret the result."  Sent. Tr. at 2 (attached as Exhibit F).  Judge Mukasey knew the facts of the case well from the trial.  He knew about Conigliaro's history and his role in the mafia and before imposing a life sentence remarked to Mr. Lewis, "I am sure about the result too, but whatever Mr. Conigliaro had coming to him was not something that you could administer lawfully."  *Id*. at 3.

DiTorra, who had proposed to his crew members that Mr. Lewis be used for the killing, cooperated and served six years.  Massa, who organized the conspiracy, proposed the plan to Mr. Lewis and hired him, received 420 months and is scheduled to be released in six years.  Palermo, the acting boss who authorized the killing and benefited from it by taking over Conigliaro's business, received 132 months and has been out since 2013.  The head of the entire Decavalcante organization, John Riggi, who was responsible for dozens of acts of violence, including conspiracies to commit murder, received 120 months and has been out since 2012.  The only other defendant to receive a mandatory life sentence besides Mr. Lewis was Joe Brideson, who stored all of Conigliaro's guns, helped Massa and DiTorra develop the plans for the murder, provided the gun to Mr. Lewis, and led the lengthy effort to cover up the crime afterward.

**Life in Prison**

Mr. Lewis looks back on that time now as though it were someone else's life.  It seems both distant and hard to fathom.  The regrets are too numerous to count, and he is full of remorse.  He is not aware of any family members of Mr. Conigliaro who followed the proceedings – none attended trial – but if any were available and amenable to his outreach, he would tell them how sorry he is.  He describes his thoughts this way:

> My biggest regret is that I let other people talk me into doing something I knew in my heart to be wrong.  I regret the pain I have cause to my family and the stain upon my family's legacy.  But most of all I regret the pain I put upon the Conigliaro family.  How do I take it back? I can't.  What I did to Mr. Conigliaro was the result of the most important decision of my life, and I made the wrong one.  I live with this every day, and I pray on it every day.  By doing something that I thought was going to save my family, I did just the opposite.  I know that God has forgiven me, but I know that I have not forgiven myself and I probably never will.[4]

Mr. Lewis has been in prison for 19 years.  The years have been tough.  First, there have been the losses.  In 2016, his beloved twin sons, Jim and Bill, both died within nine months of each other at the age of 40.   Bill developed a rare and fatal cancer in his jaw.  Jim died by suicide.  The pain for Mr. Lewis was nearly unbearable:

> The loss of my two boys, Jim and Bill, are unfathomable.  There are no words to describe the feeling of loss when you lose one child but to lose both in a nine-month period and they were twins… My heart cries just thinking of them.  As youngsters I cherished them.  I have nothing but wonderful memories of us together.  It has been 4 years since their passing but I still have their email addresses on my computer and I email them every now and then to tell them how much I miss them and how much I love them and one day we will be together again.[5]

---

[4] Martin Lewis Ltr to the Court (Ex. D).

[5] *Id.*

A short time after his sons died, his older brother Michael died unexpectedly from pneumonia.   Michael was only two years older than Mr. Lewis.   They were close, and it too was a difficult loss.   The pain of these losses was, of course, exacerbated by the fact that he could not mourn with his family.   He could not attend the funerals or provide or receive physical comfort.

Then there have been the health issues.   For eight years, from 2010 to 2018, Mr. Lewis served his sentence at FCI Coleman in Florida.   The institution had a UNICOR work program, and Mr. Lewis worked in the factory making furniture for the federal government.   It was a large wood-working shop, and the dust was constantly thick.   The prisons are not subject to OSHA standards, and air quality and ventilation were substandard, to put it mildly.   After many years of breathing the dust for 8 hours a day, five days a week, he developed chronic bronchitis, asthma, and related unknown respiratory ailments.

In late 2013 he had his first serious bout of respiratory distress in which he found himself "unable to breath."[6]   He was diagnosed with chronic asthma and bronchitis and given a course of steroids and inhalers.[7]   His most recent medical records continue to show his chronic asthma and bronchitis as well as a host of other chronic conditions, including allergic rhinitis, Barrett's esophagus, Diaphragmatic hernia, and various forms of arthritis and orthopedic ailments.[8]   His current list of medications includes his two different inhalers:  the Albuterol inhaler which he uses during times of acute respiratory distress and a Mometasone Furoate inhaler which he uses

---

[6] *See* BOP Request for Administrative Remedy, May 19, 2014 (a complaint Mr. Lewis filed detailing his respiratory distress and treatment) (attached as Exhibit G).

[7] *Id.*

[8] BOP Medical Records (Ex. B).

daily.[9]  He takes several other medications on a regular basis, including a statin for high cholesterol and Omeprazole for his esophageal problems.[10]

Despite his many hardships, Mr. Lewis has maintained an extraordinary spirit and outlook.  Before the COVID lockdown, he regularly attended Catholic mass and led bible study classes.  He provided mentorship and counseling to those who suffer from mental health issues.  And he has always attempted to improve himself.  Before the lockdown, he was taking a 500-hour carpentry course.  He would like to work, but Sheridan discontinued its UNICOR program four years ago.

In his 19 years in prison, he does not have a single disciplinary infraction.[11]  He takes every class and program available.[12]  And he has remained very close to his beloved daughters.  He speaks to them regularly and is especially close to his youngest, Natalia, who is now 24 years old.  They speak on the phone or email every day that he is not on lockdown.

Since the COVID shutdown, conditions have been brutal.  For several months, the lockdown was severe – virtually 24 hours a day seven days a week with no movement.  He was only allowed a shower every three days.  There was no recreation, phone calls, or programming.  And just as conditions were easing ever so slightly, the wildfires shut things down again.  The air quality has been awful, and Mr. Lewis has found it constantly difficult to breathe.   And, of

---

[9] *See* BOP "Active Prescriptions" attached as Exhibit H.

[10] *Id.*

[11] BOP SENTRY Records (Ex. C).

[12] *Id.*

course, he lives with the constant anxiety of contracting COVID-19 which for him in particular could prove fatal.

## ARGUMENT

## I.      Under the First Step Act, this Court Has Expansive Authority to Reduce a Sentence.

Under a provision of the recently-enacted First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court,

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment …, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; …
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ….

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement, U.S.S.G. § 1B1.13, includes a list of "extraordinary and compelling reasons" based on the medical condition of the defendant, his age, certain family circumstances, and "other reasons" "other than, or in combination with, the reasons" specifically listed in the policy statement. *See* U.S.S.G. § 1B1.13, Application Note 1(A)-(D). The Commission also requires that the "defendant is not a danger to the safety of any other person or to the community."

But as this Court has repeatedly recognized, "courts are not, in any case, bound by this Guidelines provision and may grant compassionate release 'on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1." *United States v. Austin*, No. 06 Cr. 991, Dkt. No. 72 at 7 (JSR) (S.D.N.Y., June 23, 2020) quoting

11

*United States v. Pinto-Thomaz*, No. 18 Cr. 579 (JSR), 2020 WL 1845875, at * 2 (S.D.N.Y. Apr. 13, 2020).

Indeed, the First Step Act's changes to § 3582(c)(1)(A)—titled "Increasing the Use and Transparency of Compassionate Release"—were designed to help get more non-dangerous individuals out of prison. "The First Step [Act] was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *See, e.g., United States v. Redd*, No. 97 Cr. 06 (AJT), 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). "Congress's express purpose in implementing these changes was to expand the use of compassionate release sentence reductions …."

The First Step Act sought to expand the use of sentence reductions in two primary ways: First, the Act empowers defendants to petition district courts directly for a reduction, rather than having to wait for the Bureau of Prisons to bring a motion on their behalf. Second and relatedly, the Act shifts greater discretion to courts to determine what constitutes "extraordinary and compelling" reasons for a reduction under the statute. Essentially, with the First Step Act, Congress empowered the judiciary to take on the role the BOP once held as the functional adjudicator of compassionate release requests and enabled courts to grant reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" language in the statute.[13]

---

[13] This is consistent with the original intent of the statute. As Judge Preska recently explained, Congress envisioned § 3582(c)(1)(A) as a "safety valve" to permit courts to reduce sentences when justified, which would also maintain "sentencing power in the judiciary where it belongs" (rather than with a parole board). *United States v. Eric Millan*, No. 91 Cr. 685 (LAP), ECF Dkt. 1060 at 15-16 (S.D.N.Y. Apr. 6, 2020) (quoting S. Rep. No. 98-225, at 56 (1983)). Further, nothing in the statutory text or legislative history indicates that Congress originally intended sentence reductions to be reserved for "elderly defendants," "defendants with compelling medical circumstances," or defendants with particular family circumstances. *Id.* at 16-17.

Based on this authority, district courts have reduced sentences for a variety of reasons—even if the reductions are opposed by the Bureau of Prisons and even if the reasons do not fit within the Sentencing Commission's specifically enumerated bases. For example, many courts have reduced defendants' sentences based on the ongoing threat COVID-19 poses to individuals in prison (the list of cases is far too numerous to cite).

Courts have also reduced sentences where the defendant's original sentence now seems disproportionately high, where a defendant has demonstrated extraordinary rehabilitation, or where other factors counsel in favor of a reduction. *See, e.g.*, *United States v. Kevin Haynes*, 93 Cr. 1043 (RJD), ECF Dkt. 114 (E.D.N.Y. Apr. 22, 2020) (reducing a 46-year sentence based on "stacked" § 924(c) sentences to time served based on the severity of the sentence); *United States v. Eric Millan*, No. 91 Cr. 685 (LAP), ECF Dkt. 1060 at 25-29 (S.D.N.Y. Apr. 6, 2020) (reducing sentence of 57-year old defendant from life to time served, 28 years, based on defendant's exceptional rehabilitation, length of time already served, and demonstrated remorse); *United States v. Redd*, 2020 WL 1248493 at *8, n.18 (collecting cases regarding court's authority and reducing sentence based on severity of defendant's "stacked" § 924(c) sentences); *United States v. Maumau*, No. 08 Cr. 758 (TC), 2020 WL 806121, at *6 (D. Utah Feb. 18, 2020) (reducing sentence based on severity of sentence and defendant's young age at the time of the offenses); *United States v. Urkevich*, No. 03 Cr. 37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (reducing sentence based on original sentence's undue severity); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (granting release because defendant was the sole available caregiver for his ailing mother).

As these cases demonstrate, and as this Court has recognized, judges are not limited to the specific enumerated examples set forth by the Sentencing Commission in finding "extraordinary and compelling" reasons for release.

## II.    Mr. Lewis Has Met Any Statutory "Exhaustion" Requirement.

In order to petition the Court directly for a sentence reduction under § 3582(c)(1)(A), a defendant must wait until "after [he] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

In other words, as this Court has held, the statute permits a defendant to bring a motion directly to a court "after *either* exhausting administrative review of a BOP denial of his request *or* after 30 days had passed since he made his request, whichever was earlier." *United States v. Haney*, No. 19 Cr. 541 (JSR), 2020 WL 1821988, at *1 (S.D.N.Y. Apr. 13, 2020); *see also, e.g.*, *United States v. Resnick*, No. 12 Cr. 152 (CM), ECF Dkt. 461 at 9-11 (S.D.N.Y. Apr. 2, 2020) (granting release of defendant who had served 61.7% of six-year fraud sentence and finding exhaustion requirement met where defendant submitted request to BOP over 30 days prior); *Redd*, 2020 WL 1248493 at *4 (finding inmate could pursue release in court because he submitted request to BOP and it did not act within 30 days); *United States v. Beck*, No. 13 Cr. 186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (same).

Further, under certain circumstances, courts have the authority to waive this 30-day waiting period. *See, e.g.*, *Haney*, 2020 WL 1821988 at *3-4; *United States v. Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 at 7-15 (S.D.N.Y. Apr. 19, 2020); *Wesam El-Hanafi*, No. 10 Cr. 162 (KMW), ECF Dkt. 252 at 3-5; *United States v. Phillip Smith*, No. 12 Cr. 133 (JFK), ECF Dkt. 197 at 5-8 (S.D.N.Y. Apr. 13, 2020).

Mr. Lewis submitted a request to the Warden of FCI Sheridan in May 2020 seeking release on grounds relating to his health and the dangers of COVID-19.  He received no response.  He has thus satisfied the 30-day waiting period.

14

**III.** **There are Extraordinary and Compelling Reasons to Reduce Mr. Lewis's Sentence.**

    **A.** **COVID-19 and Mr. Lewis's Serious Respiratory Illness**

Mr. Lewis is among those most at risk of dying from COVID-19. His well-documented, long-standing respiratory ailments, and chronic bronchitis in particular, are considered among the most dangerous pre-existing health conditions for which there is the "strongest and most consistent evidence" of developing "severe illness" from COVID-19.[14] Combined with his chronic asthma and his age, those severe risks increase exponentially. A person in their 60s is four times more likely to be hospitalized than someone in their 30s and three times more likely than someone in their 40s.[15] And those exponential age-related increases do not account for the increased risks from pre-existing medical conditions. In short, these "co-morbidities" of age and multiple pre-existing medical conditions make him undeniably at high risk for severe illness or death.

Mr. Lewis's health conditions cannot be reasonably disputed. His respiratory illness is well-documented and stretches back at least seven years. The additional respiratory challenges from the recent and ongoing wildfires in Oregon is also beyond dispute.

---

[14] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People at Increased Risk* (Listing chronic bronchitis as a type of COPD in the group of the most severe pre-existing health conditions in which there is the "strongest and most consistent evidence" of higher risk and noting additional "mixed" evidence surrounding the elevated risk from asthma) found at  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#copd (last searched September 22, 2020)

[15] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Risk for Severe Illness Increases with Age* (showing chart with risk increasing exponentially with age) found at   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last searched September 22, 2020).

Mr. Lewis is incarcerated at FCI Sheridan which had its first confirmed case of COVID-19 in late July and at least four other positive cases since.[16]  Although the numbers may seem low, there has been a complete lack of systematic testing for COVID-19 throughout the BOP, and a widely acknowledged undercount of the actual rates of positivity.[17]  And even if the numbers could be relied upon, they say very little about the future threat of COVID-19 outbreaks.  Indeed, all of the BOP facilities where a significant number of people have died from COVID-19, went from very few cases to serious outbreak in very short order.

Because of how quickly COVID-19 spreads in a prison environment, facilities that previously had zero cases can become deadly hotspots within a matter of days or weeks. For example, on April 3, the government opposed a release motion for an inmate in FCI–Butner, citing the BOP's generic COVID-19 policies, such as screening, visitation lockdown, and social distancing. *See United States v. Rumley*, No. 08-cr-5, Dkt. 185, at 4–7 (W.D. Va. Apr. 3, 2020).  On March 24th, Butner reported its first case.  By April 14th, four incarcerated people had died and 45 were confirmed infected.[18]   By May 4, six incarcerated people had died and 210 were confirmed infected.[19]   By May 27, ten

---

[16] *COVID-19 Cases*, BOP Online, available at https://www.bop.gov/coronavirus/.

[17] Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons Have COVID-19*, Associated Press, Apr. 29, 2020 found at https://apnews.com/article/fb43e3ebc447355a4f71e3563dbdca4f.

[18] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (archived copy, Apr. 14, 2020), https://web.archive.org/web/20200415200817/https://www.bop.gov/coronavirus/index.jsp.

[19] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

incarcerated people died from Covid-19 and at least 370 inmates have been infected.[20]
And, despite the BOP's precautions, the virus has infected Butner's medical center, which
houses extremely medically vulnerable inmates.[21]

FCI-Terminal Island is another example. As of April 13, 2020, that prison reported
seven positive cases among its incarcerated population and two positive staff cases.[22] Two
weeks later, those numbers exploded—687 prisoners had tested positive and nine had
died.[23]

Similar outbreaks have occurred at federal prisons in Forrest City, Lexington,
Elkton, Oakdale, and Fort Worth.[24] Each of those institutions appeared to have infections

---

[20] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 27, 2020),
https://www.bop.gov/coronavirus/index.jsp.

[21] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020),
https://www.bop.gov/coronavirus/index.jsp.

[22] *Id.*

[23] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 27, 2020),
https://www.bop.gov/coronavirus/index.jsp.

[24] *See, e.g.*, Debbie Holmes, *After Six COVID-19 Deaths, Judge Orders Elkton Prison
to Transfer At-Risk Inmates*, WOSU Radio (Apr. 22, 2020), https://radio.wosu.org/post/after-
six-covid-19-deaths-judge- orders-elkton-prison-transfer-risk-inmates#stream/0 (discussing
Elkton); Sadie Gurman, et al., *Coronavirus Puts a Prison Under Siege*, Wall Street Journal,
(Apr. 6, 2020), https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-
into-death- sentences-11586191030 (discussing Oakdale); Scott Gordon, *COVID-19 Cases
Nearly Quadruple Inside Fort Worth Federal Medical Prison*, NBC DFW (Apr. 23, 2020),
https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at-fort-worth-
federal- prison/2356912/ (discussing Fort Worth); Mitchell McCluskey et al., *A North Carolina
prison complex has 60 inmates and 23 staff members with coronavirus*, CNN (Apr. 12, 2020),
cnn.com/2020/04/12/us/butner-prison-coronavirus-cases/index.html. On April 24, an outbreak
of COVID-19 cases at the Federal Medical Center in Lexington, Kentucky "led to a sharp
increase" in the area's COVID-19 cases, "when the city had settled into a period of relatively
few new cases." Daniel Desrochers, *Outbreak of COVID-19 reported at Federal Medical
Center in Lexington: 33 inmates positive*, Lexington Herald-Leader (May 1, 2020),
https://www.kentucky.com/news/coronavirus/article242449731.html.; *COVID-19 Coronavirus*

under control – until they didn't.  Each went from low reports of positive cases to multiple

deaths within weeks:  a total of 78 dead.

Courts have regularly found COVID-19 a threat to inmates regardless of the numbers of

positive cases in a particular BOP facility, even in facilities with no reported cases. *See, e.g., United*

*States v. Ivars Ozols*, No. 16 Cr. 692 (JMF), ECF Dkt. 488 (S.D.N.Y. June 2, 2020) ("the threat of

COVID-19 to those in prison constitutes an extraordinary and compelling reason for

compassionate release"); *United States v. Alberto Pena*, 15 Cr. 551 (AJN) (May 8, 2020), 2020

WL 2301199 (same); *United States v. Adam Field*, No. 18 Cr. 426 (JPO), ECF Dkt. 38 at 2-4

(S.D.N.Y. May 4, 2020) (same); *United States v. Gregory Cooper*, No. 08 Cr. 356 (KMK), ECF

Dkt. 181 (S.D.N.Y. Apr. 28, 2020) (same); *United States v. Jeffrey Musumeci*, No. 07 Cr. 402

(RMB), ECF Dkt. 58 (S.D.N.Y. Apr. 28, 2020) (same); *United States v. Feucht*, Case No. 11-cr-

60025, Dkt. No. 53 (S.D. Fla. May 28, 2020) (granting compassionate release despite no confirmed

cases at FCI Jessup because "[z]ero confirmed cases is not the same thing as zero COVID-19

cases" (citation omitted)); *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL

1904585, **2-4 (D. Nev. Apr. 17, 2020)(granting compassionate release to defendant Atkinson,

notwithstanding that FCP Atwater where he was housed had seen no cases of COVID-19 because

the realities of prison life make it impossible for medically vulnerable inmates like Mr. Atkinson

to follow CDC guidelines to protect themselves in the face of COVID-19); *United States v.*

*Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate

from FCI Loretto, despite no reported COVID-19 cases at the facility, because he could not

adequately protect himself in line with CDC guideline); *United States v. Asaro*, No. 17-CR-127

---

*page*, Federal Bureau of Prisons (May 27, 2020), https://www.bop.gov/coronavirus/index.jsp.

(ARR), 2020 WL 1899221 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released.").

The sudden outbreaks and the inability to contain them when they happen come as no surprise. As the CDC has noted, "[i]ncarcerated persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[25] The CDC thus recognizes the herculean challenge of keeping prison facilities insulated from COVID-19:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.* Limited space and overpopulation, inadequate ventilation, and lack of resources all contribute to the spread of infectious disease in jails and prisons. The federal prison system simply is not, in spite of its best efforts, capable of preventing a harrowing outbreak.

---

[25] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020).

In short, by the time an outbreak occurs, it is often too late to do anything about it. The combined 122 dead at BOP facilities that insisted they were safe before outbreaks occurred are a stark reminder. And as the country prepares for a second wave of infection with the weather turning cold and the traditional flu season approaching, Mr. Lewis, 66 years old with severe respiratory illness, could very well pay for an outbreak with his life.

### B.    The Circumstances of Mr. Lewis's Offense and Comparative Sentences

When Judge Mukasey sentenced Mr. Lewis to life in prison, he had no choice. The sentence was mandatory. As discussed above, for the other co-defendants where Judge Mukasey had discretion, he exercised it in ways that provided just sentences for those defendants, but necessarily created significant disparities with Mr. Lewis.

To be sure, Mr. Lewis committed a terrible crime. But he was truly on the bottom rung of the ladder among the conspirators. The acting boss of the organization who authorized the shooting and benefitted the most from it, Palermo, has been a free man for seven years. The head of the entire crime family, Riggi, who was involved in numerous murder conspiracies, has been out for eight years. And the man that actually orchestrated the killing, who hired Mr. Lewis and provided the plans, Americo Massa, is set to be released in six years.

A murder conviction, no matter the relative culpability, deserves a severe sentence. But Mr. Lewis, with over 19 years in prison, has now served the equivalent of a 23-year sentence. Even without considering the mitigating circumstances here, it is longer than the median sentencing for a murder conviction in both the Southern District of New York (median sentence

for 47 murder cases in 2019 was 219 months)[26] and in federal court nationally (median sentence in 2019 was 240 months).[27] And it is far more than the median amount of time served for murder in state courts (approximately 13 years).[28]

Mr. Lewis has been punished harshly. And it has cost him dearly. Every time he writes to his now-deceased sons' old email accounts to tell them how much loves them or speaks with his young daughter Natalia to learn about milestones in her life that he has missed, he is vividly reminded of how much he has lost.

And, of course, in the wake of COVID-19, the punishment has only gotten harsher. Conditions at FCI Sheridan as reported in *The Oregonian* have been grim:

> Inmates at Sheridan report that they've been held in cells for for 23 hours a day and sometimes for up to 72 hours straight due to the prison lockdown. Some have reported that their trash isn't collected from cells during the lockdown, and inmates are allowed a shower only once every three days.
>
> Two weeks after the lockdown went into effect, one inmate at the Sheridan FDC committed suicide. Inmates report that two other detainees engaged in acts of self-harm while locked in their cells, one reportedly slashing his neck. Other inmates report they are stressed and feel poor physically due to cramped conditions, lack of fresh air, lack of exercise, and poor food. [29]

---

[26] United States Sentencing Commission Sourcebook tbl. 15 (2019) (median sentence for murder is 240 months) found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nys19.pdf.

[27] United States Sentencing Commission Sourcebook tbl. 15 (2019) (median sentence for murder is 240 months) found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table15.pdf.

[28] U.S. Dept. of Justice, Bureau of Justice Statistics, *Time Served in State Prison, 2016* (Nov. 2018) (median time served for murder in all state courts is 13.4 years) found at https://www.bjs.gov/content/pub/pdf/tssp16.pdf.

[29] https://www.oregonlive.com/coronavirus/2020/07/inmate-tests-positive-for-coronavirus-atfederal-prison-in-sheridan.html

Adding to the misery now is the smoke-filled air from the encroaching wildfires and the additional recent lockdowns.

In sum, all of the core bases for a severe sentence, including retribution, general deterrence, and specific deterrence, have been fully satisfied. A sentence reduction to a 23-year sentence would be just and appropriate, especially in light of the sentences imposed on Mr. Lewis's co-defendants.

### C.  Rehabilitation

Lastly, there can be little doubt that Mr. Lewis poses no threat to the community and has changed for the better in his two decades in prison. In 1998 a horrible confluence of events led Mr. Lewis to make the worst decision of his life. He was deeply depressed, desperate to keep his young girls from the influence of their heroin-addicted mother, and without the means to provide for them or live anywhere other than the trailer in the backyard of a mob-controlled bus company. He was preyed upon by members of a powerful crime family who knew how desperate he was and convinced him that shooting Joe Conigliaro was the right thing to do.

In his nearly 20 years in prison, he has been a model inmate. He has not had a single disciplinary infraction. He has worked at every opportunity when job programs were available, including eight years building furniture, a job he cherished so much that he continued it even when it was apparent that it was causing severe damage to his lungs. He ministers to others continually. Although he is not highly educated, he has a remarkable ability to sense the pain and needs in others. And he has been driven by his Catholic faith and deep sense of service to act upon that ability.

Perhaps the greatest sign of his warmth and humanity is his ongoing relationship with his daughters, and in particular with his youngest, Natalia. She writes to the Court about their extraordinarily frequent correspondence, both by email and phone.

> It might seem strange but even from prison he has been the most present parent in my life. To be able to have my father back and for him to be able to be in his daughters and grandson's life would mean the world to us…

> Since my father has been in prison we have communicated by telephone. He would call once week and talk to the both of us after he spoke with our adoptive mother. The first few years was normal but after some time our adoptive mother would make us keep things from our father. I started writing letters to my father instead and was able to call him again when I got my own phone. We still spoke weekly, I made sure not to miss his calls. I kept him updated on my life events with pictures and letters outside of the phone calls. I was able to visit my father for the first time in many years when my boyfriend offered to drive me the 4 hours to see him. Shortly before I left home, we started talking more frequently from two to three times a day to every other day, now we talk everyday sometime twice a day on top of emails. Over the years we have gotten closer, my father has supported me with every decision I've made and chance I've taken.

As discussed in her letter, Natalia moved from Oregon to Charlotte, North Carolina last spring. Her sister, Eileen ("Tilly"), still lives in Oregon. Natalia would love for her dad to live with her in Charlotte. She and her partner have a house in a nice neighborhood with plenty of space. They are financially stable and she welcomes the chance to have him in her life: "It would mean a lot to me to have a loving parent physically in my life for what seems like the first time ever…To have him back in my life now would be lifechanging for both of us."

## CONCLUSION

Any of the above bases could provide "extraordinary and compelling" reasons to reduce Mr. Lewis's sentence: his serious respiratory illness and the risk that COVID-19 presents in prison; the 23-year sentence that he has now served; and the things he has done to improve himself and others for the past two decades. But combined they are particularly persuasive. Mr. Lewis poses

23

no threat to society, and he has been punished severely.  For these reasons, we respectfully request

that Your Honor reduce his sentence.


Dated: New York, New York
       September 24, 2020

                                        Respectfully submitted,


                                        _/s_____
                                        David Patton
                                        Counsel for Martin Lewis